### Albert Dallemand et al. v. Isaac Saalfeldt, Adm.

1. NEW TRIALS—*Grounds for Not Mentioned in Written Motion Are Waived.*—All reasons for a new trial not specified in the written motion, if any, must be deemed to have been waived, and can not be considered on appeal.

2. TRIALS—*Instructions to Find for Defendant.*—Whether a trial court should instruct the jury to find for the defendant depends on whether or not there is evidence tending to support the plaintiff's case, and if there is such evidence an instruction to find for the defendant should be refused.

3. SAME—*An Instruction to Find for the Defendant Held Properly Re-fused.*—In a suit by an administrator to recover damages for the death of his intestate alleged to have been caused by an accident on a defective elevator the court holds that the evidence shows that the defendant failed to comply with a city ordinance in regard to elevators, and that it tends strongly to show that the deceased was rightly on the elevator and engaged in the line of his duty when the accident occurred and that the question whether his death was caused by the negligence of defendant was a proper question for the jury.

4. ORDINARY CARE—*When It May Be Presumed.*—Where it is manifestly impossible to prove by direct evidence that a person killed as a result of the alleged negligence of another, was exercising ordinary care at the time of the accident, a jury may infer such care from evidence that the deceased was sober, industrious, careful and of good habits.

**Trespass on the Case.** Death from negligent act. Appeal from the Superior Court of Cook County; the Hon. JONAS HUTCHINSON, Judge, presiding. Heard in this court at the October term, 1897. Affirmed. Opinion filed January 17, 1898.

MARCUS KAVANAGH and F. J. CANTY, attorneys for appellants.

MOSES, ROSENTHAL & KENNEDY, attorneys for appellee.

MR. JUSTICE ADAMS DELIVERED THE OPINION OF THE COURT.

Appellee recovered judgment against appellants in the trial court for negligence alleged to have caused the death of his intestate, David Saalfeldt.

At the conclusion of the appellee's evidence, appellants, by their attorney, moved the court to direct a verdict for the defendants on the ground that the evidence did not support the declaration, and requested the court to give to the jury the following instruction: "The jury are instructed that the plaintiff has not proven his case, as alleged in the declaration, and you are therefore instructed to find the defendants not guilty." The court refused to so instruct the jury, and appellants asked no other instruction, nor did they in-

troduce any evidence. The jury found the appellants guilty, and assessed appellee's damages at the sum of $1,750. Motions for a new trial and in arrest of judgment were overruled, and judgment was entered on the verdict.

There are seven formal assignments of error. The first four are substantially the same, namely, that the court erred in not directing a verdict for the appellants; the sixth and seventh are that the court erred in overruling appellants' motion in arrest of judgment and in entering judgment; the fifth is that the court erred in overruling appellants' motion for a new trial. The motion for a new trial sets forth substantially, although in different forms, only a single reason for the motion, namely, that the court erred in not directing a verdict for appellants. All reasons for a new trial not specified in the written motion, if any, must be deemed to have been waived, and can not be considered here. Ottawa O. & F. R. V. R. R. Co. v. McMath, 91 Ill. 104, 111–112.

Therefore, the only question to be considered is whether the trial court erred in refusing to peremptorily instruct the jury to find for appellants, and the determination of this question depends on whether or not there was evidence tending to support appellee's case. If there was such evidence, appellants' instruction was properly refused. Cicero & P. St. R'y Co. v. Meixner, 160 Ill. 320, 328; Louisville, N. A. & C. Railway Co. v. Patchen,1 67 Ib., 204, 214; Siddall, Jr., v. Jansen et al., 168 Ib. 43.

The declaration contains numerous counts in which it is alleged, substantially as follows: That defendants possessed and operated a certain freight elevator in the building at 51 Lake street, Chicago, in which building defendants carried on the business of bottling wines and liquors for sale; that under the ordinances of the

city of Chicago, it was defendant's duty to employ
some competent person to take charge of said elevator
and operate it; to fasten metal doors to said elevator
and to put catches or fastenings on said doors so that
they could be opened only from the inside of the shaft;
that defendants negligently disregarded their duty
in this behalf, by means whereof plaintiff fell down said
shaft and was killed; that defendants permitted said
elevator to be operated without the employment of a
competent person to run the same, and permitted the
deceased to operate said elevator while in the discharge
of other duties, knowing the inexperience of deceased;
that on August 20, 1894, defendants ordered deceased
to proceed in the elevator from the basement to the
fifth floor, and failed to furnish a competent elevator
man to run said elevator; that said elevator was run in
a shaft without any doors or protection whatsoever;
that defendants did not reasonably protect said hoist-
way so as to prevent persons from falling into and
down the same, etc.

The evidence shows that the building in which the
elevator in question was, was occupied by appellants
as lessees, and was used by them in their business,
which was that of wholesale dealers in wines and liquors
and bottling the same.  The building was in the city,
and consisted of a basement and five stories.  The
washing and filling of bottles was done in the basement.
On the third floor were bottles, on the fourth floor
goods and original packages delivered by distillers were
kept; there were empty bottles on the fifth floor.  The
appellee introduced in evidence the following sections
of an ordinance of the city of Chicago:

"Sec. 1571.  Hoistways in which the elevator shall
be used shall be constructed entirely of brick, from its
lowest point, extending up through and six feet above
the roof.  All openings in such hoistways shall be pro-

tected by iron doors and no wood shall be used upon the inside of such hoistways.

"Sec. 1572. Doors in such shaft shall be made of metal, and the catches or fastenings upon such doors shall be so placed that they can be opened only from the inside of the shaft and entirely under the control of the elevator operator.

"Sec. 1573. All openings not having doors shall have metallic frames with prismatic lights in iron frame.

"Sec. 1614. All doors in shafts of elevators shall have latches so contrived that a key shall be used to unlatch the doors from the outside, but may have a knob or handle to open the door from the inside.

"Sec. 1653. It shall be the duty of every person owning, controlling, operating or using—as owner, lessee or agent—any passenger or freight elevator in any building, within the corporate limits, to employ some competent person to take charge of and operate the same; and any such person who shall neglect to comply with the provisions of this section shall be fined the sum of ten dollars for each and every day of such neglect."

The material of which the elevator shaft and doors were constructed, and the manner of construction, is shown by the evidence to have been as follows: The back part of the shaft was a wall of the building; the other three sides and the door in front, through which there was access to the elevator from each floor, were wholly of wood, and could be opened either from the elevator or the inside of the shaft, or from the outside or room side. In the basement and fourth and fifth floors were folding doors working on hinges and, including both doors, about six feet in width. The first, second and third stories had sliding doors, the full width of the respective openings, and were operated by lifting or sliding up the door toward the ceiling,

where it remained till pulled down. There was a bar across each door from two and a half to three feet from the floor, which was attached by a hinge at one end, and could be raised or lowered from either inside or outside the elevator. No particular person had charge of the elevator or its operation at the time of the accident, nor was any person employed by appellants for that special purpose. Sam. B. Eisendrath, an architect, called as a witness for the plaintiff, described the elevator as follows: "The elevator carriage itself is the regular form of a freight elevator; simply a large platform with the usual side-bars and cross-bars to hang the carriage on." This description is not very clear, but from it we understand that there were upright bars at the sides of the platform connected above by a cross-bar or bars, to which was attached the cable from which the platform was suspended. The elevator was moved by hydraulic power, and there was a little catch by using which it could be held in a fixed position at any floor. It stopped automatically at the fifth floor.

It appears from the evidence that appellee's intestate was, at the time of his death, nearly twenty-one years of age, and that he had been in the employ of appellants about five weeks; that he was quiet, sober, industrious, of good habits, and very careful; that he earned in appellants' employ about $6.00 per week, and gave his wages to his mother. His duties were mainly in the basement. In the afternoon of August 20, 1894, John P. Casey, an employe of appellants, who was foreman of the bottling department of the business, and who was then on the third floor of the building, called through the speaking tube to John Cavanaugh, who was in the basement, for some bottles which he, Casey, says he wanted. The filling of bottles was, on that day, done on the third floor. Cavanaugh, another employee of appellants, had charge of the basement.

David Saalfeldt, the deceased, George Darmody and Con. Byrne, were at some tubs distant from Cavanaugh about forty feet when he received the order from Casey, and he, Cavanaugh, says, "I took the order from the speaking tube, and I spoke down to the tubs—told them they were needed." The order from Cavanaugh was not directed to any one of the persons above mentioned in particular, but was general, and the deceased immediately proceeded to comply with it, by going up in the elevator with bottles. Casey, who remained on the third floor, says that the deceased stopped at that floor and took a case of bottles out of the elevator, and that he, Casey, took the bottles back to the barrels out of which they were to be filled, and that as the deceased was starting up from the third floor he, Casey, asked him where he was going, and he said he was going up for some bottles which Casey had previously ordered. Casey also says that the deceased was going up to the fifth floor for empty bottles, that the empty bottles were on that floor. It is true that Cavanaugh testified that there were standing orders to Darmody and Byrne to take up bottles, and that Saalfeldt, deceased, had no orders so to do, but there being no evidence that the deceased was ever ordered not to take them up, and the order of Cavanaugh being general to Darmody, Byrne and the deceased, it was clearly a question for the jury whether the deceased was acting in obedience to an order and in the line of his duty. Keating, appellants' superintendent, says of deceased: "His duty was to fill bottles, clean them properly and put them to drain. It was not his special duty to bring up and down bottles, but he did so at times."

In about half a minute, as Casey testifies, after the deceased started up on the elevator from the third floor, he fell down the shaft. The evidence is that the de-

ceased fell to the basement floor, and that his neck was broken, death, almost instantly, being the result. No one saw how the accident occurred. The evidence also tends to prove that the doors opening from the different floors into the elevator shaft were open at the time of the accident. There having been no eyewitness of the accident, it was manifestly impossible to prove by direct evidence that the deceased, at the time of the accident, was exercising ordinary care. Under such circumstances the jury might well infer from the evidence that he was sober, industrious, careful and of good habits, that he was, at the time of the accident, exercising ordinary care. Chicago, B. & Q. R. R. Co. v. Gregory, 58 Ill. 272, 278–9; Missouri Furnace Co. v. Abend, 107 Ib. 44; Chicago & A. R'y Co. v. Carey, 115 Ib. 115; Toledo, St. L. & K. C. Railroad Co. v. Bailey, 145 Ib. 159; Illinois C. R. R. Co. v. Nowicki, 148 Ib. 29.

Whether the negligence of appellants caused the accident, was a question to be determined by the jury from all the evidence.

In Siddall v. Jansen, 168 Ill. 43, which was case for negligence in respect to an elevator, the trial court directed a verdict for the defendant. The Supreme Court, after quoting certain sections of an ordinance containing requirements as to elevators, say: "The evidence produced by the plaintiff below tends to show there was not, on the part of the defendants, a compli· ance with the ordinance. A peremptory instruction having been given to the jury to find for defendants, there was, consequently, no evidence produced by them. As there was evidence tending to show there was no compliance with the provisions of this ordinance, and that plaintiff was rightfully at the place of the injury, it was a question which should have been submitted to the jury." Ib. 47.

In the present case the evidence is conclusive that there was no compliance by appellants with the city ordinance, and strongly tends to show that appellee's intestate was rightfully on the elevator and engaged in the line of his duty when the accident occurred, and, as before stated, it was a question proper to be submitted to the jury, on the evidence, whether the death of appellee's intestate was caused by the negligence of appellants.

The judgment will be affirmed.