## David T. Corbin, Adm'r, v. Western Electric Co.

1. ORDINARY CARE—*Evidence—Killed in an Explosion.*—The proof that a deceased person was sober, temperate in his habits, industrious, and generally cautious and careful, is evidence from which (there being no eye-witnesses) the jury may infer that at the time of the accident in which he lost his life, he was exercising ordinary care for his personal safety.

2. PRACTICE—*Taking a Case from the Jury.*—Where the evidence tends to prove the material allegations of the declaration, the case should be submitted to the jury.

3. SAME—*Motion for a New Trial—Reasons Not Stated, Can Not be Considered in This Court.*—Where there is a written motion for a new trial, assigning reasons for the motion, and the exclusion of evidence is not one of the reasons assigned, it can not be considered on appeal.

4. EVIDENCE—*Manner and Cause of Accidents.*—Direct proof by eye-witnesses of the manner and cause of an accident, is not necessary to a recovery for an injury received resulting in death. Circumstantial evidence, from which the manner and cause of death may reasonab'y be inferred, is sufficient on which to submit the question to a jury.

**Action for Damages.**—Death from negligent act. Trial in the Circuit Court of Cook County; the Hon. ABNER SMITH, Judge, presiding. Verdict for defendant by direction of the court. - Appeal by plaintiff. Heard in this court at the March term, 1898. Reversed and remanded. Opinion filed July 21, 1898. Rehearing denied November 3, 1898.

A. B. MELVILLE, attorney for appellant; D. T. CORBIN, attorney *pro se.*

WILLIAMS, HOLT & WHEELER, attorneys for appellee.

MR. JUSTICE ADAMS delivered the opinion of the court.

This was an action by appellant against appellee for alleged negligence resulting in the death of appellant's intestate. At the conclusion of the evidence for the plaintiff, the court, on motion of the defendant, instructed the jury to find the defendant not guilty. A verdict was rendered accordingly, and judgment was entered thereon. The chief question presented by the record is, whether there was evidence tending to prove the material facts alleged in the

declaration as constituting the plaintiff's case.  The declaration contains three counts.  The averments of the first count are, substantially, that, July 31, 1894, defendant (the appellee) was engaged in the manufacture and sale of electrical appliances and machinery, and also in the invention and development of an explosive material or compound for blasting rock and other hard substances, which material defendant represented to the public and Frederick R. Corbin, deceased, was harmless, and not capable of being exploded, except when confined and treated by electric currents or shocks from electrical machines and appliances for, to wit, thirty minutes, and then only by intense heat; that, July 1, 1894, the defendant, by one Charles H. Rudd, then and for a long time prior thereto in its employ, was preparing said material for use by placing the same in long sections of iron pipe closed firmly at both ends, and connecting therewith a wire or wires through which electrical currents could be transmitted to and through said material when said pipe or pipes should be placed for blasting purposes, and connected with an electric battery; that for about one year prior to July 31, 1894, Frederick R. Corbin, deceased, had been in defendant's employ in the department of its business devoted to the manufacture of electrical appliances, and that, while he was so employed, he was directed by the defendant to perform such other services in mixing the ingredients of said material and placing for blasting purposes the said iron pipe, under the superintendence and direction of the said Rudd, as he should require; that the said Corbin, deceased, was ignorant of said material and its operation, and did not know that it was dangerous, or that it was explosive except when confined and treated as aforesaid, but, in fact, it was not harmless and was liable to explode without being treated as aforesaid, and there was danger to the said Corbin, deceased, in mixing and preparing the same and placing and confining the same in iron pipes to be used as aforesaid, which defendant knew, or ought to have known, and by reasonable care and caution could have known.  And it was defendant's duty to make good its said representations and to provide

said Corbin, deceased, with safe appliances, methods and material, etc., and apprise him of said danger, which duty defendant neglected to perform. That July 31, 1894, while said Corbin, deceased, under the direction and superintendence of said Rudd, and in the exercise of due care and caution, was proceeding to prepare, fill and load, and while he did prepare, fill and load certain iron pipes with said material, and was proceeding to wire the same for blasting purposes, the said material, without having been treated as aforesaid, exploded and killed the said Frederick R. Corbin. The count then avers that the plaintiff left him surviving certain persons, his father and others, his next of kin, naming them, etc., and concludes with an *ad damnum.*

It is averred in the second count that the defendant represented to the deceased that there was no danger of injury to him in working in and about the said material, that it was perfectly safe to handle, and would not explode by shock or contact with fire, until confined in pipes or shells and heated, or treated by electrical currents, after which, to produce an explosion, it was necessary to fire it by an electric spark, controlled by an operator. Also that, July 31, 1894, while deceased was, in a prudent and careful manner, in the presence and under the superintendence of Charles H. Rudd, at work handling and preparing for use iron pipes or shells containing said explosive compound, and before the same was treated, as aforesaid, the compound exploded and killed him. It is not necessary to refer to the third count here.

The plaintiff's intestate was employed by the defendant November 27, 1891, and continued in its employ till July 31, 1894, when he lost his life. The defendant corporation was engaged in the manufacture and sale of electrical appliances. Charles H. Rudd was employed by the defendant about July 30, 1887. Among his duties was the working at and endeavoring to perfect a new explosive for the defendant. Mr. Patterson, the defendant's superintendent, testified that Rudd had been working on the explosive since the summer of 1892. The compound was composed

Corbin v. Western Electric Co.

of chloride of potassium and paraffine oil, and was prepared by mixing the potassium with the oil in a vessel, the mixture being mechanical, the oil merely coating the potassium. The manner of preparing the compound for use is described by the witnesses substantially as follows: An iron pipe or shell about eight or ten feet long and about three inches in diameter, was plugged closely at one end with a wooden plug; to this plug were attached three wires: two German silver wires coiled spirally, so that the spirals came in contact with the inner surface of the tube; a copper wire was also inserted in the shell, which had on it three exploders. The exploders were paper cartridges; one was at the lower end of the wire, one about the middle and one about twelve inches from the top of the pipe. The lower two were composed of saltpetre and paraffine oil, the upper one of chloride of potash and lamp black. The pipe being plugged at the lower end and tarred, and the wires inserted and attached thereto, as stated, the mixture of potassium and paraffine oil was put into the pipe with a small scoop, such as grocers use in ladling sugar, etc. When full, except the space left for a plug, the upper ends of the wires were inserted or drawn through holes in a plug similar to that in the other end of the pipe, and the plug, with the wires protruding through it, was driven into the upper end of the pipe. In driving the upper plug in, a piece of iron resting on the plug, but not touching the wires, was used, and the plug was driven in by striking the iron with a wooden mallet, four inches by six inches at the end and eight or ten inches in length, the handle being inserted in a hole in the centre of the mallet, as is usual. The blasting was done as follows: The pipe was inserted in a hole prepared to receive it, in a bank of clay or bed of rock, when the pipe was connected with a dynamo and treated for about thirty or forty minutes, by passing through the German silver wires a current of electricity, the effect of which was to raise its temperature, after which an electric spark was communicated to the wire to which the exploders were attached, and to the exploders, when an explosion occurred.

When Frederick R. Corbin, deceased, entered the employ of appellee, he was about twenty-two years and nine months old. He was a graduate of the Northwestern University, and more than usually intelligent. His object in taking employment with appellee was to acquire a practical knowledge of electricity and its uses. He was first employed for a few weeks in appellee's switchboard department, wiring switchboards, from which department he was transferred to appellee's electrical light department, where his duty was to test arc lamps. He remained in the latter department about a year. Before Mr. Rudd went to Hawthorne, Cook county, Illinois, where the accident hereafter mentioned occurred, Corbin was occasionally detailed to run circuits for Rudd, which was the only connection he had with Rudd before going to Hawthorne. In the summer of 1892, appellee, acting by Mr. Rudd, made an arrangement with Dolese & Shepard, who were working a stone quarry at Hawthorne, for Rudd to go there for the further development of his, Rudd's, explosive. Appellee's superintendent, Mr. Patterson, testified that the entire matter of developing and experimenting with the explosive was left by appellee to Rudd; that he had entire direction and control of the matter at Hawthorne, and that he, Mr. Patterson, transferred Corbin to Rudd's department and sent him to Rudd at Hawthorne, to act under Rudd's directions. Corbin went to Hawthorne accordingly, November 11, 1892, and remained there, assisting Rudd and acting under his superintendence and direction, until his death. The evidence shows that Corbin's work, while at Hawthorne, was mixing or assisting to mix the explosive compound, loading it in the iron pipes, preparing the pipes for blasting, and as heretofore stated, assisting in the explosion. Many explosions in clay banks and rocks had been made, by way of experiment, prior to the time of the accident.

The situation and circumstances at Hawthorne on the morning of July 31, 1894, were substantially as follows : Rudd had constructed of rough boards at the northeast corner of the quarry, and close to the quarry, a one-story shanty

about fifteen feet in length from north to south, and about ten feet in width, the floor of the shanty being about even with the surface of the outside ground. There was a door on the side of the shanty farthest from the quarry and a railroad track some little distance from that side; the exact distance does not appear. There was a workbench around the side of the shanty; beneath it was a basement with a door opening out on the rock on the quarry side. There was an opening about the center of the floor of the shanty; and there was a stairway from the shanty to the basement. There were in the shanty a dynamo, electric switchboard, and other electric devices, and a lathe, and in the basement were a boiler, a small engine, four barrels of oil, and coal and wood. Before the accident a lot of shells or pipes had been prepared ready for use, and some of them were placed standing up against the shanty on the outside.

Bates, an employe of Dolese & Shepard, testified that he was in the shanty between seven and eight o'clock on the morning of July 31, 1894; that Corbin, Rudd, and two men of the name of Clark, employes of Rudd, were there, and that Corbin had a pipe, one end of which was in the basement and the other above the hole in the floor on which Corbin said he was going to work. This witness was in the shanty a second time that morning. He testified: " I was there last about nine o'clock. I went into the upstairs floor—was not downstairs. There was a shell there through the floor and Mr. Corbin was working on the shell; one of those long shells. Don't know what Mr. Rudd was doing; he was working at one of the benches. The lower end of that shell rested on the basement floor and the upper end was two or three feet through the shop floor; it was standing right on its end. Prof. Rudd was two or three feet from Mr. Corbin. I don't know just exactly what Mr. Corbin was doing; know he was working around the shell; was putting the plugs in. He was fixing the wires and putting on the finishing touches to the shell ready to go into the ground. I was there about five minutes."

The two Clarks were there then. They were getting ready for a big shot. Benjamin Steventon, fireman at quarry, employed by Dolese & Shepard, testified that he was at the shanty about 10 A. M., July 31, 1894, and saw Corbin, Rudd and one of the Clarks working; that Corbin and Rudd were working in the room over the basement, and Clark was pulling up through the floor a loaded shell. Charles H. Shepard testified that he was in the shanty fifteen or eighteen minutes before the explosion, and that Rudd was standing by a bench and mixing something in a small mortar which would hold about a pint, and Corbin was working on a shell, the end of which came up through the hole in the floor; that he was soldering some wire together by means of a soldering iron and a gasoline torch placed five or six feet from the shell; that the flame went into an iron T, and he ran the soldering iron inside the T to heat it; that the plug was not then in the top of the shell.

Michael T. Goodman testified that he was in the shanty on the same morning about seven or eight minutes before the explosion; that Rudd was standing on the east side of the shanty mixing a black "mixture" in a mortar. He says: " Mr. Corbin was working around the shell that protruded up through the floor, and also was working around the wires. To the best of my recollection he was working around the shell with a mallet and with wires of different kinds—whatever demanded his attention." The two Clarks were below in the basement at that time. The last witness had been preparing holes for Mr. Rudd in which to place loaded pipes for blasting, and went to the shanty to inform Mr. Rudd that the holes were about ready. The first explosion occurred about eleven o'clock A. M. It is described by the witnesses Bates, Goodman and Steventon as a sort of muffled sound like an explosion in a building, and not like a sharp explosion in the quarry when the shells go off. The witnesses, on hearing the explosion, looked toward the shanty and saw that it was in flames. They ran toward it and when nearly there Rudd came out of the door covered with flames and bleeding, and they heard Corbin moaning

and crying out, " Save me! Oh, save me!" and the two Clarks moaning and hallooing in the basement, all three being apparently too disabled to escape.    The explosion had sprung the boards on the sides of the shanty, and the men tried to pull them off to get at Corbin, but could not.    They ran to get fire hose and water, but in a few minutes a second and terrific explosion occurred which completely wrecked the building and scattered it in all directions, killing Corbin and the two Clarks.    Mr. Rudd subsequently died.    Corbin's body was found near to or on the railroad track, about fifteen feet from the shanty, and the bodies of the two Clarks in the quarry about 150 to 200 feet from the shanty. The boiler which had been in the basement was also found in the quarry.    The evidence is that there had been no fire in the boiler that morning, that the dynamo had not been in operation, and that there had been no treatment of the explosive by passing a current of electricity through it; also, that there had been no fire in the shanty except the flame of the kerosene torch in the iron T, five or six feet away from the pipe on which Corbin was last seen working.    V. J. Hall, professor of chemistry in the Woman's Medical College of the Northwestern University, to whom had been submitted for examination some of the material with which the pipes were charged, and also some of that contained in the exploders, testified that the material with which the pipes were loaded would not produce an explosive shock when unconfined, even if exposed to flame, but, if confined, it could be exploded by friction, pressure or shock; that if a small quantity of it were placed on an iron plate or anvil and stricken with a hammer, an explosion would result. Also that it would explode without having been previously treated with electricity, as heretofore described.    He further testified that the black mixture of chloride of potash and lampblack, used as an exploder, is an exceedingly sensitive explosive; that slight friction, shock or flame would explode it; that he put a small quantity of it in a mortar and rubbed it slightly with a pestle and it exploded.    He also testified that the driving the plug into the top of the

pipe, as heretofore described, was not a safe mode of procedure; that it might create atmospheric pressure on the material in the pipe and thus produce an explosion.

The following question was asked the witness and answer given:

"Q. You were examined by Mr. Wheeler in reference to the effect of driving this plug, 'Exhibit C' with the wires in it, with a mallet, down into one of these shells that were loaded—driven below the upper rim. You may state the effect or what effect it might have. A. If the main explosive compound, with the exploders placed in their proper position, were filled approximately to the iron tubing, filled full, and this plug driven down upon that mixture, there would be friction within the large particles of this main explosive, potassium chlorate, and also friction of these large particles against the small black compound, which I have already stated is very sensitive, and sufficient, I think, almost to bring about a spark or a flame from the exploder, from the black compound, thereby causing an explosion of the main substance. Furthermore, the driving down of that plug, if small quantities of this black compound, or possibly, the main explosive or light compound, got between the iron flue or shell and this plug, and striking a blow with a hammer, might produce a spark, which, conducted to the main explosive, would bring about an explosion."

We are of opinion that the evidence tended to prove that Corbin lost his life in the manner stated in the declaration. The evidence further tended to prove that the deceased received no instruction as to explosives at the Northwestern University; that he had no practical experience in relation to explosives prior to his going to Hawthorne; that he was unaware of any danger in handling the explosive in question or of doing the work which he did under Rudd's superintendence and direction, and that the evidence strongly tends to prove that Rudd claimed, and on a number of occasions, the last within a month prior to the accident, stated in the presence and hearing of the deceased, that it was entirely safe to handle and work with the

explosive as did the deceased, and that it would not explode unless treated with electricity for thirty or forty minutes, as heretofore described. The evidence of Professor Hall with regard to the dangerous character of the explosive tends to prove that the appellee, by its agent and vice-principal, Rudd, might, in the exercise of ordinary care, have discovered its dangerous character, and that it would explode without having been previously treated with electricity. The evidence that the deceased was sober, temperate in his habits, industrious and generally cautious and careful, was evidence from which (there being no eye-witnesses) the jury might infer that at the time of the accident he was exercising ordinary care for his personal safety. Dallemand v. Saalfeldt, 73 Ill. App. 158, and cases there cited.

In brief, we are of opinion that the evidence tended to prove the material allegations of the declaration, and that the case should have been submitted to the jury. Cicero St. Ry. Co. v. Meiner, 160 Ill. 320; Railway Co. v. Patchen, 167 Ib. 204; North C. St. R. R. Co. v. Wiswell, 168 Ib. 613; Siddall v. Jansen, Ib. 43; Dallemand v. Saalfeldt, supra, 151.

Counsel for appellant, in their argument, object that the court improperly excluded evidence offered by appellant. There was a written motion for a new trial, assigning reasons for the motion, and the exclusion of evidence is not one of the reasons assigned. The rule in such case is, that all reasons not specified are deemed waived, and can not be considered on appeal. Ottawa, etc., Railroad Co. v. McMath, 91 Ill. 104; W. C. St. R. R. Co. v. Krueger, 168 Ib. 586; Dallemand v. Saalfeldt, 73 Ill. App. 151.

Some remarks of the learned judge who presided at the trial would seem to indicate that, in his opinion, direct proof by eye-witnesses, of the manner and cause of the accident, is necessary to a recovery. We do not understand this to be the law. Circumstantial evidence, from which the manner and cause of death may reasonably be inferred, is sufficient on which to submit that question to the jury. Smith v. Peninsular Car Works, 60 Mich. 501; Railway Co. v. Carey, 115 Ill. 115.

The judgment will be reversed and the cause remanded.